IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NANCY WEBER,

                    Plaintiff,

vs.

COUNTY OF LANCASTER,

                    Defendant.

4:17-CV-3117

MEMORANDUM AND ORDER

The plaintiff, Nancy Weber, is suing her former employer, Lancaster County, for allegedly discriminating against her in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*.; violating the Family Medical Leave Act (FMLA) 29 U.S.C. § 2601 *et seq*.; violating Nebraska Fair Employment Practice Act (NFEPA) Neb. Rev. Stat. § 48-1101 *et seq*.; and retaliating against her for activity protected by all three provisions.

This matter is before the Court on the defendant's motion for summary judgment (filing 54). For the reasons set forth below, the Court will grant that motion in part and deny it in part.

## I. BACKGROUND

From 2000 until she was constructively discharged in May 2015, Weber worked as a paralegal in the Child Support Division at the Lancaster County Attorney's office. Filing 55 at 18. During the first few years of Weber's employment, each child support matter was staffed using a "team approach"—using one legal secretary and one paralegal. *See* filing 55 at 5. Under that staffing method, legal secretaries generally worked to obtain child support orders from the court (*i.e.*, the establishment phase) while paralegals generally

monitored support payments and prepared bench warrants if obligations were not being met (*i.e.*, the enforcement phase). *See* filing 66 at 3; filing 69 at 1.

But in 2013, the Division implemented a "single case owners" approach. Under this case structure, a single employee, either a former secretary or paralegal, now handled both the establishment and enforcement phase of any given case. Filing 66 at 4; filing 69 at 2. Although County employees were not required to transition to the single case owner approach, Weber allegedly volunteered to switch to the new structure. *See* filing 58-2 at 28-29; 32. Under the single case owner approach, Weber was now in charge of conducting custodial party interviews, setting up case files, filing legal documents electronically, and other tasks previously performed by legal secretaries during the establishment phase of a given matter. *See* filing 58-2 at 29-30; filing 66 at 4; filing 69 at 3-4. Weber also continued to perform her previous enforcement duties—such as preparing support orders, monitoring child support payments, and preparing bench warrants. *See* filing 66 at 3.

The transition from the "team approach" to the "single case owner approach" was, however, difficult for Weber. *See* filing 58-2 at 96. In particular, Weber admits that while she was staying close to the required two-week turnaround, she was having a hard time doing so. Filing 58-2 at 69.

And while Weber attempted to adjust to work as a single case owner, she also experienced personal hardships outside of the work place. On October 2014, Weber's husband had a heart attack requiring open heart surgery. *See* filing 58-2 at 50. Weber used FMLA leave to take care of her husband while he recovered. *See* filing 58-2 at 53. But, according to Weber, she was only permitted to take intermittent rather than full FMLA leave. *See* filing 58-2 at 57. And because she was not allowed to take full leave, Weber contends that she was required to work five hours a day, in addition to providing around-the-clock care of her husband. Filing 58-2 at 57. The stress of having to juggle her

responsibilities at work while also caring for her husband, Weber claims, caused her rheumatoid arthritis to flare up. Filing 66 at 5.

In an effort to accommodate her rheumatoid arthritis, Weber requested the following accommodations: (1) a split keyboard, (2) a headset, (3) relocating her files, and (4) to be transitioned back to a paralegal position under the team approach (as opposed to the single case owner). *See* filing 58-2 at 126-127. The County accommodated most of those requests: it provided Weber with a split keyboard and a headset, and relocated her files to just outside her office door. *See* filing 58-2 at 83; 126-127. But the County declined to transfer Weber to cases still using the team approach. *See* filing 15 at 8; filing 58-2 at 83. So, Weber continued to work as a single case owner and tried to keep her workload at a manageable level. Filing 58-2 at 69.

On April 7, 2016, Weber informed the County that she needed to take FMLA leave for a surgery she had scheduled in May. *See* filing 58-2 at 67. The foot surgery was necessary to repair a deformity in her foot caused by her rheumatoid arthritis. *See* filing 66 at 1. But before her scheduled surgery, the County informed Weber that she was required to attend a pre-disciplinary meeting regarding purported performance issues. *See* filing 69 at 10.

In that meeting, the County informed Weber that there were problems with many of her case files. *See* filing 58-2 at 69. Specifically, the County noted that Weber had not been keeping up with her workload. *See* filing 58-2 at 69. Two days later, the County informed Weber that she could either retire, or be terminated. Filing 58-2 at 70. When presented with that choice, Weber reluctantly decided to retire. Filing 58-2 at 70.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. DISCUSSION

Weber's operative complaint challenges the County's decision not to transfer her to a paralegal position under the team approach, as well as its subsequent decision to constructively terminate her employment. Filing 15 at 7-15. Weber also contends that the County interfered with her right to take

FMLA leave on at least two occasions: (1) in 2014 when her husband was recovering from his heart attack, and (2) in 2016 when she tried to take FMLA leave for a scheduled a foot surgery. Filing 69 at 10-11.

The County argues that Weber's claims are time-barred and, alternatively, that each allegation fails as a matter of law. Filing 54. The Court will begin its analysis with Weber's claims that the County discriminated against her disability before moving on to Weber's contentions that the County interfered with her rights to FMLA leave and retaliated against her for exercising her right to FMLA leave.

## 1. ADA AND NFEPA

As briefly noted above, Weber alleges that the County engaged in disability discrimination in violation of the Americans with Disability Act of 2008 (ADA), 42 U.S.C. § 12101 *et seq.* and the Nebraska Fair Employment Practices Act (NFEPA), § 48-1101 *et seq.* Filing 15 at 8-15. In particular, Weber claims that the County failed to reasonably accommodate her disability, discriminated against her disability, and retaliated against her disability. The County has moved for summary judgment on both of those claims.

Before turning to the merits of that claim, however, the Court must address the County's contention that Weber's allegations under the NFEPA and ADA are time-barred. Under both statutory schemes, a plaintiff must file a written charge of an alleged unlawful employment practice within 300 days of the events giving rise to her claims. *See* Neb. Rev. Stat. § 48-1118(2); § 12117 (incorporating 42 U.S.C. § 200(e)-5(e)(1)). This 300-day clock begins to run at the time of the discrete discriminatory or retaliatory act, and not when the consequences of the act become most painful. *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980); *Conner v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th Cir. 1996). A discriminatory act can be the denial of a request for a

reasonable accommodation, termination, failure to promote, denial of transfer, or refusal to hire. *See Dick v. Dickinson State University*, 826 F.3d 1054, 1059 (8th Cir. 2016); *Taxi Connection v. Dakota, MN & Eastern R.R. Corp.*, 513 F.3d 823, 825 (8th Cir. 2008). So, for Weber's ADA or NFEPA claim to be actionable, the discriminatory act must have occurred on or after December 21, 2015—300 days before her formal charge was filed on October 11, 2016. Filing 15 at 7.

Weber claims that the County violated the ADA and NFEPA: (1) when the County denied Weber's request to be transferred back to cases using the team approach, (2) when the County allegedly forced Weber to retire because of her disability, and (3) when the County retaliated against Weber for seeking an accommodation of her disability. *See* filing 15 at 7. With respect to Weber's latter two contentions, those claims are clearly within the 300-day limitations period. Indeed, Weber claims that in May 2016, she was discharged based, at least in part, on the County's discriminatory and retaliatory animus toward Weber's disability. *See* filing 66 at 22. That occurred just a few months before Weber filed her charge and as such, Weber's discrimination claim is not barred. *See Dick*, 826 F.3d at 1059.

But Weber's request to be transferred back to cases using the "team approach" is outside of the 300-day statutory window. Filing 58 at 27. As noted above, the 300-day clock begins to run at the time the discriminatory act occurred—not the time the consequences become most painful. *Delaware State College*, 449 U.S. at 258; *Conner*, 84 F.3d at 1102. That means the window for Weber's reasonable accommodation request began to run at the time Weber's accommodation request was denied—on June 26, 2015—rather than at the time she was terminated. *See* filing 58 at 27. But June 26, 2015 is approximately 475 days before her formal charge was filed. And the Court is not persuaded by Weber's contention that because she renewed her request to return to the team setting in January 2015, that her accommodation claim is

timely. *See* filing 66 at 19. After all, any subsequent request for the *same* accommodation does not, and cannot, restart the statute of limitations period. *See Taxi Connection v. Dakota, Minnesota & E. R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008); *see also Mercer v. Se. Pennsylvania Transit Auth.*, 26 F. Supp. 3d 432, 442 (E.D. Pa. 2014), *aff'd sub nom. Mercer v. SEPTA*, 608 F. App'x 60 (3d Cir. 2015); *Brown v. Reg'l W. Med. Ctr.*, 916 N.W.2d 590, 597 (Neb. 2018).

So, while Weber's disability discrimination and retaliation claims are not barred by the statute of limitations, the County's denial of Weber's request to be returned to a team setting is time-barred and cannot be considered for Weber's disability claim. *See Conner v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th Cir. 1996).

That brings the Court to the County's substantive argument: that Weber cannot, as a matter of law, demonstrate that the County discriminated or retaliated against Weber's disability. Filing 55 at 38. As an aside, Weber appears to conflate her retaliation and disability discrimination claims—which she generally advances under a cat's paw theory of liability that will be discussed in more detail below. More specifically, Weber contends that Chief Deputy County Attorney Cyr used County Attorney Joe Kelly as a dupe "in a deliberate scheme to discriminate or retaliate" against Weber. Filing 66 at 13. And Cyr's comments, Weber claims, create a factual dispute as to whether the County's alleged discriminatory or retaliatory animus was the proximate cause of Weber's constructive discharge. *See* Filing 66 at 13.

But proof of a retaliation claim is not the same as a direct claim of disability discrimination, so although Weber's evidence tends to overlap on those two claims, the Court will analyze them separately.[1]

_____

[1] Because the discrimination and retaliation provisions in NFEPA are patterned after the ADA, the Court will consider those claims under the same analysis used for ADA claims.

(a) Disability Discrimination

Weber may establish a claim of disability discrimination by offering direct evidence of discrimination or by satisfying the *McDonnell Douglas* burden-shifting framework. *Hustvet v. Allina Health Sys*., 910 F.3d 399, 412 (8th Cir. 2018). As best the Court can tell, Weber generally contends that there is sufficient evidence to create a question for the fact-finder under either framework.

"Direct evidence" is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. More specifically, direct evidence includes evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor. *Lipp v. Cargill Meat Sols. Corp*., 911 F.3d 537, 544 (8th Cir. 2018)

Weber appears to argue that various comments made by Cyr constitute direct evidence of disability discrimination.[2] As noted above, to support why,

---

*Ryan v. Capital Contractors, Inc*., 679 F.3d 772, 777 (8th Cir. 2012); *Orr v. Wal-Mart Stores, Inc*., 297 F.3d 720, 723 (8th Cir. 2002).

[2] Weber's briefing does not articulate whether she is proceeding under the direct-evidence framework. *See* filing 66 at 22. And according to the County, there is "no direct evidence of retaliatory animus." Filing 55 at 38. But as the Eighth Circuit has found, "cat's paw cases involve [] direct-evidence claims, *e.g., Qamhiya*h, 566 F.3d at 742; *Richardson v. Sugg*, 448 F.3d 1046, 1059-60 (8th Cir. 2006), not claims pursued through the McDonnell Douglas burden-shifting framework." *Diaz v. Tyson Fresh Meats, Inc*., 643 F.3d 1149, 1152 (8th Cir. 2011). So, the Court will proceed with the understanding that Weber's cat's paw theory relates to allegations of direct discrimination.

in her view, there is evidence of disability discrimination Weber advances a so-called cat's-paw theory of liability. Indeed, according to Weber, Cyr used final decision maker, Kelly, as a dupe in a deliberate scheme to trigger a discriminatory employment action. *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 802 (8th Cir. 2015) (applying the cat's paw theory on a NFEPA claim); *see also Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cri. 2013); *Othman v. City of Country Club Hills*, 671 F.3d 672, 676 (8th Cir. 2012); *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009). That theory, in essence, allows an employer to be vicariously liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory or retaliatory animus and intentionally and proximately causes the action. *Ludlow*, 788 F.3d at 802; *Staub v. Proctor Hospital*, 562 U.S. 411 (2011).

In this case, Weber argues that Cyr harbored discriminatory animus against her because of her disability. *See* filing 66 at 14; *see also Ludlow*, 788 F.3d. at 802. To support that contention, Weber points to a conversation that occurred during a March 19, 2015 pre-disciplinary meeting. *See* filing 69 at 7; *see also* filing 66 at 9. During this meeting, Weber claims that Cyr told her "that [her] hands looked fine, [and] asked [her] when [she] was going to retire . . . ." Filing 69 at 8. Weber also claims that Cyr always opposed the idea of placing Weber back in the team setting. *See* filing 66 at 14. Based on that conduct, along with Cyr's comment about her hands, Weber claims the jury could infer that Cyr used Kelly as a dupe for deliberate discrimination.

But that argument fails for a number of reasons. To begin, even if the Court were to assume, for sake of argument, that Cyr's comment could be attributed to Kelly, Weber's claim still cannot survive summary judgment. Indeed, Cyr's comment was made over one year before Weber was constructively discharged. And a comment made nearly a year before from any

conversations about termination actually began is simply too far removed from Weber's actual termination to create an inference of discriminatory animus. *See Lors v. Dean*, 746 F.3d 857, 866 (8th Cir. 2014).

Moreover, courts must be careful to distinguish between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by non-decisionmakers, or statements by decisionmakers unrelated to the decisional process. *Id.* But Cyr's offhanded comment that Weber's hands "looked fine," filing 58-2 at 93, is precisely that— a stray remark in the workplace. There is no evidence in the record that Cyr's comment, however insensitive, had any bearing on the final decision to terminate Weber's employment nearly one year after the comment was made. Filing 69 at 8; *see Ludlow*, 788 F.3d at 802; *Lors*, 746 F.3d at 866.

So, the Court concludes that Weber has failed to provide any direct evidence of discrimination. Because there was not sufficient evidence of direct evidence, to survive summary judgment, Weber must proceed using the three-part *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination by demonstrating: (1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) a causal connection between an adverse employment action and the disability. *Lipp*, 911 F,3d at 544. If the plaintiff succeeds, the burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. *Id.* The burden then returns to the plaintiff to show that the employer's proffered reason was a pretext for discrimination. *Id.*

In this case, the parties' dispute turns on the issue of pretext. To establish pretext, Weber must present sufficient evidence to demonstrate both that the County's articulated reason for the adverse employment action was false and that discrimination was the real reason for her termination. *Lindeman v. Saint Luke's Hosp. of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) Here, Weber claims that the County's proffered reason was not the true reason for her termination. *See* filing 66 at 22. That is true, Weber claims, because there is clear evidence of animus based on Cyr's statements. Filing 66 at 22. But for the same reasons discussed in the previous section, that argument is based on a stray remark that is far too attenuated in time to support an inference of discriminatory animus. *Smith*, 625 F.3d at 1088; *Wisbey*, 612 F.3d at 676; *Allen Health Sys., Inc.*, 302 F.3d at 833. So, the Court will grant the County's motion for summary judgment on those grounds.

(b) Retaliation

Relatedly, the County claims that Cyr's retaliatory animus was the proximate cause of Weber's termination. Filing 66 at 22. More specifically, Weber contends that the County retaliated against her accommodation request by scrutinizing her performance and searching for reasons to punish her for that request. *See* filing 66 at 22. In the usual retaliation claim, the familiar *McDonnell Douglas* framework applies. *See Diaz*, 643 F.3d at 1151. Under that framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events. *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006). If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show

a non-retaliatory reason for the adverse employment action. *Id.* (quotation marks omitted).

In this case, the parties dispute whether Weber has established that the County's legitimate, non-retaliatory reason was pretextual. *See* filing 55 at 39; filing 66 at 22. To establish pretext, Weber may provide (1) indirect evidence showing that the employer's proffered explanation is unworthy of credence because it has no basis in fact, or (2) persuading the court that a prohibited reason likely motivated the employer, which is dependent on showing sufficient evidence of intentional retaliation exists for the fact finder to believe plaintiff's allegations. *Lors,* 746 F.3d at 866. The first route, directly rebutting the proffered reason as false, usually involves more than a rebuttal of the employer's ultimate claims regarding its subjective motivations. It typically involves a broader rebuttal of the employer's underlying factual claims. *Id.* Under the second route, the plaintiff need not disprove the underlying factual claims of the employer; instead, the second route focuses on rebuttal of the employer's ultimate factual claim regarding the absence of retaliatory intent. *Id.* In effect, a plaintiff may concede that the proffered reason, if truly the motivating cause for the termination, would have been a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action. *Id.*

Similar to her discrimination claim, Weber contends that the County's proffered reason for her termination was not the *true* reason for her termination. To support that contention, Weber points to Cyr's alleged retaliatory animus. Using the cat's paw theory of liability, Weber contends that Cyr used Kelly as a dupe in a deliberate scheme to trigger a retaliatory

employment action. *Ludlow*, 788 F.3d at 802.[3] In particular, Weber claims that Cyr's retaliatory animus is shown through Cyr's continued "search for grounds to discipline Weber" after she requested to be transferred back to the team setting in May 2015. Filing 66 at 23.

But, as noted above, even if it were true that Cyr engaged in some sort of a fishing expedition that could be attributed to Kelly, Weber's retaliation claim still fails as a matter of law. For Weber's claim to succeed under a cat's paw theory, the question for the Court is: "[Is] there, on the record as a whole, a genuine dispute for trial on whether [Cyr's] retaliatory animus was a proximate cause of [Weber's] firing?" *Diaz*, 643. F.3d at 1152.

The Court thinks not. For instance, there is no evidence from which a jury could conclude that Cyr's alleged retaliatory animus actually caused Weber's termination. There is no evidence in the record that Cyr recommended that Weber be terminated, much less any evidence that Kelly relied on any recommendation from Cyr in making his determination about Weber's employment.[4] *Id.; see also* filing 58-3 at 14. In fact, the opposite is true. Kelly testified that although he does his best to gather all the information about the situation before he makes the decision, he ultimately made the decision to terminate Weber "on [his] own." *See* filing 58-3 at 14. And there is nothing in the record to suggest that Cyr's purported animus toward Weber, in any way, infiltrated Kelly's decision making process. That means Cyr's alleged hostility

---

[3] There is some tension in this argument. As discussed above, the Eighth Circuit has not yet applied the cat's paw theory to claims under the *McDonnell Douglas* framework. *See* Diaz, 643. F.3d at 1152. But because his cat's paw theory fails on its own terms, the Court need not address that internal tension.

[4] The only evidence in the record is that Cyr made a recommendation in March that Weber receive a one-day suspension for a different infraction. *See* filing 58-1 at 21.

cannot support an inference that Cyr intended that Weber was fired in retaliation for her requests to be switched back to the team approach. *See Diaz, 643 F.3d at 1151*.

So, in sum, Weber's allegation that the County failed to accommodate her disability by transferring her back to cases using the "team approach," is barred by the statute of limitations. With respect to Weber's remaining disability discrimination claims, Weber's explanation as to why, in her view, the County's discriminatory or retaliatory animus was the reason for her termination, is insufficient to create a genuine issue of material fact. Thus, the Court will grant the County's motion for summary judgment on those grounds.

## 2. FMLA CLAIM

Weber's allegations that the County interfered with her right to leave under the Family Medical Leave Act ("FMLA"), however, fare better. The FMLA authorizes two types of claims: interference or retaliation. *Sisk v. Picture People, Inc., 669 F.3d 896, 899 (8th Cir. 2012)*. Confusion often arises as to whether an employee's FMLA claim is really about interference with her substantive rights, not discrimination or retaliation. *Id.*; *Kauffman v. Fed. Express Corp., 426 F.3d 880, 884 (7th Cir. 2005)*. The difference between the two claims is that an interference claim merely requires proof that the employer denied the employee her entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent. *Stallings, 447 F.3d at 1050*. But in some circumstances, a given set of facts will fall clearly into either (a)(1) or (a)(2); lines between the two categories are not hard and fast. *Id.*

This is one of those cases. *See* filing 15 at 7. As such, Court will begin its analysis with Weber's interference claim, before moving on to Weber's retaliation claim.

(a) Interference

The FMLA entitles an eligible employee to twelve weeks of unpaid leave during any twelve-month period if she has a serious health condition that makes her unable to perform the functions of her position. 29 U.S.C. § 2612(a)(1)(D). Employees are also eligible for leave when certain family members—spouse, son, daughter, or parent—have serious health conditions. 29 U.S.C. § 2611(13); 29 C.F.R. § 825.122(a). The Act makes it unlawful for an employer to "interfere with, restrain, or deny" an employee who exercises or attempts to exercise that right. 29 U.S.C. § 2615(a)(1).

To succeed on a claim of FMLA interference, Weber must show she was eligible for FMLA leave, the employer knew she needed FMLA leave, and the employer denied her an FMLA benefit to which she was entitled. *See Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016); *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015). Weber argues that the County interfered with her entitlement to FMLA leave on two occasions: (1) in November 2014 when the County did not allow her to take full leave after her husband's open heart surgery, and (2) in May 2016 when the County forced her to retire two days before her scheduled FMLA leave. *See* filing 15 at 8-9.

According to the County, however, both claims must be dismissed. In particular, the County contends that its failure to provide full leave as opposed to intermittent leave in 2014 is barred by the statute of limitations. *See* filing 55 at 25-28. And even if that alleged interference with Weber's FMLA leave is not time-barred, it must be dismissed as a matter of law. *See* filing 55 at 25-28. Finally, the County claims that Weber cannot demonstrate how, if at all, the County interfered with Weber's FMLA leave in 2016 because her employment was terminated before the County was able to approve her FMLA leave. *See* filing 55 at 28.

The Court will begin with the County's statute of limitations argument. For FMLA claims, Congress created a two-tiered statute of limitations. Generally, the statute of limitations for an FMLA violation is "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1); *Hanger v. Lake Cty.*, 390 F.3d 579, 582 (8th Cir. 2004). But where an employer engages in a "willful violation" of the FMLA, the statute of limitations is extended to three years. 29 U.S.C. § 2617(c)(2); *Hanger*, 390 F.3d at 582.

This lawsuit commenced on September 1, 2017—within the three-year statute of limitations for willful violations, but outside the general two-year limitations period. *See* filing 1 at 1; § 2617(c)(1)-(2). That means the question for the Court is whether this case warrants the additional year for "willful" violations. *See* 29 U.S.C. § 2617(c)(2); *Hanger*, 390 F.3d at 582.

The FMLA does not, however, define willful. Nor has the Supreme Court expressly defined "willful" in the context of the FMLA. *Hanger*, 390 F.3d at 582. But courts, including the Eighth Circuit, have applied the definition of "willful" as explained in the context of the Fair Labor Standards Act to FMLA claims. *Id.*; *see also Bass v. Potter*, 522 F.3d 1098, 1103 (10th Cir. 2008); *Hoffman v. Prof'l Med. Team*, 394 F.3d 414, 417-18 (6th Cir. 2005); *Porter v. New York Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004); *Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003). And in the context of the Fair Labor Standards Act, an employer engages in a willful violation when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Hanger*, 390 F.3d at 582.

Applying that standard to the present case, the Court concludes that Weber has failed to provide the Court with sufficient evidence suggesting that the County engaged in willful conduct. To the contrary, it is undisputed that Weber did, in fact, receive intermittent FMLA leave to care for her husband in

2014. *See* filing 58-2 at 121; filing 58 at 5. More specifically, the County allowed Weber to take up to 480 hours of leave while her husband was recovering from heart surgery. Filing 58 at 5. And the Court finds it difficult to image a scenario where actually providing FMLA leave constitutes a willful violation. *See* 29 U.S.C. § 2617(c)(2); *Hanger*, 390 F.3d at 582. While it may be true that the County should have provided full leave instead of intermittent leave, that misunderstanding cannot rise to the level of a "reckless disregard" for the FMLA. *See e.g.*, *Mozingo v. Oil States Energy, Inc.*, 661 F. App'x 828, 830 (5th Cir. 2016) (a negligent violation does not constitute a willful violation); *Crugher v. Prelesnik*, 761 F.3d 610, 617 (6th Cir. 2014) (determining that when the employer was simply negligent in interpreting the employee's rights under the FMLA, there is not enough evidence to support a finding of willfulness); *Bass*, 522 F.3d at 1104 (finding that when the employer endeavored to comply with the FMLA, there was no willful violation.).

So, the Court concludes that Weber has failed to establish that the County willfully violated the FMLA. *Hanger*, 390 F.3d at 582. That means, the general two-year statute of limitation period applies to Weber's allegations that the County interfered with her right to FMLA leave in November 2014. *See* 29 U.S.C. § 2617(c)(1). Because Weber filed this lawsuit on September 1, 2017—more than two years after the alleged November 2014 FMLA violation, *see* filing 1 at 1—that claim is time-barred.[5]

---

[5] Weber's complaint also references a request for medical leave on August 24, 2015 when she had bronchitis that turned into pneumonia. *See* filing 15 at 5. But that leave request was approved, and Weber returned to work on September 1, 2015. Filing 15 at 5. Even if that could state some sort of FMLA claim, that allegation is barred by the two-year statute of limitations. *See* 29 U.S.C. § 2617(c)(1).

Next, the County claims that Weber's allegations surrounding the County's interference with her FMLA leave in May 2016 fail as a matter of law. *See* filing 55 at 22-23. This is true, the County contends, because it would have approved Weber's FMLA request had it not made the decision to terminate her employment. *See* filing 55 at 23 n. 1.

The Court does not agree. An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercised of any right contained in the FMLA. 29 U.S.C. § 2615(a)(1); *Stallings*, 447 F.3d at 1050. Interference includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA. 29 C.F.R. § 825.220(b); *Stallings*, 447 F.3d at 1050. In other words, an employer "cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies." 29 C.F.R. § 825.220(c). And an employer's action that deters an employee from participating in protected activities constitutes an "interference" or "restraint" of the employee's exercise of his rights. *Stallings*, 447 F.3d at 1050.

Simply put, when an employer attaches negative consequences to the exercise of protected rights, it has "chilled" the employee's willingness to exercise those rights because he or she does not want to be fired or disciplined for doing so. *Id.* Here, a reasonable fact-finder could conclude that the County "chilled" Weber's willingness to exercise her FMLA rights. *See id.* That is true because, as Weber correctly points out, she informed the County of her need for FMLA leave to undergo foot surgery on April 7, 2016. *See* filing 58-1 at 39; filing 58-2 at 67. Shortly after she gave the County her formal FMLA documentation, Weber was informed that she needed to attend a pre-disciplinary meeting. *See* filing 58-2 at 70. After this meeting—and just days

before Weber's scheduled foot surgery—her employment was terminated. *See* filing 58-2 at 68. Based on that evidence, the fact-finder could reasonably infer that the County attached negative consequences to Weber's exercise of her rights under the FMLA.

Even so, an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights employee's. *Bacon v. Hennepin Cty. Med. Ctr.*, 550 F.3d 711, 715 (8th Cir. 2008). According to the County, Weber's performance was "plagued by inefficiency and dishonesty, two problems that became more prevalent over time." Filing 55 at 3. And it is Weber's performance rather than her request for FMLA leave, that was the cause of her termination. Filing 55 at 3; 10-11. Because the County terminated Weber for her poor performance, the County contends that it is entitled to judgment as a matter of law.

Again, the Court is not persuaded. While the record evidence illustrates that Weber was having some difficulties keeping up on her workload, *see* filing 58-2 at 69, it is also true that those concerns could, at least arguably, be linked to Weber's need to miss work for her foot surgery. Filing 58-2 at 70. And as noted above, an employer cannot use the taking of FMLA leave as a negative factor in employment actions. *See Ballato v. Comcast Corp.*, 676 F.3d 768, 772 (8th Cir. 2012). Thus, a reasonable fact finder could determine that Weber's need for FMLA leave was a factor in her termination—meaning the County interfered with Weber's right to FMLA leave. *Id.* And a jury will make that determination.

(b) Retaliation

Last, Weber claims that the County retaliated against her forcing her to retire just two days before she would need to use FMLA leave for her foot

surgery. A retaliation claim arises under § 2615(a)(2) if an employer takes "adverse action" against an employee who "opposes any practice made unlawful under the FMLA." *Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 909 (8th Cir. 2015). To establish a retaliation claim, Weber must demonstrate that she (1) engaged in protected activity, (2) suffered an adverse employment action, and (3) establish a causal connection between the protected activity and the adverse employment action. *Id.*

The parties do not dispute the first two elements. But the County does claim that Weber cannot satisfy the third element—causation. Filing 55 at 39. Specifically, the County claims that Weber has failed to connect the dots between her termination and the County's failure to give her FMLA leave. Filing 55 at 39. This is true, the County argues, because it has offered a legitimate, non-retaliatory reason for its decision. Filing 55 at 39. And because there was a legitimate reason for her termination, the County contends, Weber's claim necessarily fails.[6] Filing 55 at 39.

When an employer comes forward with evidence of a "legitimate, non-retaliatory reason" for the termination, the burden shifts back to the employee to identify evidence sufficient to create a genuine issue of material fact as to whether the employer's proffered explanation is merely a pretext for unlawful retaliation. *Id.* There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext. *Id.*; *see also Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc). A plaintiff may show that the employer's explanation is unworthy of credence because it has no basis

---

[6] The Court notes that the County's argument tends to blur the parties' burdens of proof. *See* Brown, 801 F.3d at 909. But, the parties' agree that the actual dispute hinges on the issue of pretext. See filing 55 at 39; filing 66 at 18. So, the Court will, too, focus on pretext.

in fact, or by persuading the court that a prohibited reason more likely motivated the employer. *See Brown*, 801 F.3d at 909.

Weber argues that the timing of her termination, which came a few days after she received FMLA notice and a few days before she needed to take FMLA leave, indicates that a "prohibited reason more likely" motivated the employer. *See* filing 58-2 at 72; filing 69 at 10. Although "temporal proximity standing alone" is generally insufficient to establish pretext, viewed "within the context of the overall record, [it] may directly support an inference of retaliation, and it may also affect the reasonableness of inferences drawn from other evidence." *Id.* (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1122 (8th Cir. 2006), *abrogated on other grounds by Torgerson*, 643 F.3d at 1043, 1058); *see also Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1079-80 (8th Cir. 2005).

But here, there is less than one week between the time when Weber submitted her FMLA paperwork and her termination. Filing 69 at 10. There is also only two days between Weber's termination and the proposed start date of her FMLA leave. Filing 69 at 10. Viewed together, the "temporal proximity [between those events and Weber's termination] provides strong support for an inference of retaliatory intent." *Wallace*, 442 F.3d at 1122; *see also* Brown, 801 F.3d at 909 (finding dispute of fact on issue of pretext when employee was terminated five days after complaining that her FMLA rights were violated).

And more fundamentally, the timing of Weber's termination is not the only evidence in the record that creates a dispute of fact as to pretext. Indeed, the Eighth Circuit has concluded that where an employer has known about its stated reason for taking adverse action against an employee for an extended period of time, but only acts after the employee engages in protected activity, the employer's earlier inaction supports an inference of pretext. *Brown*, 801

F.3d at 909. And as the County itself points out, Weber's performance had been an issue for some time. *See* filing 55 at 39.

For example, in March 2006, Weber received "in-house reprimand" due to ongoing concerns that Weber had not completed work in a timely manner. Filing 58 at 41. Several years later, in December, 2014, the County discovered that Weber had failed to lift sanctions and activate an enforcement case on time. *See* filing 58 at 34. On March 26, 2015, the County sent Weber a letter proposing a one-day suspension based on its discovery that Weber had cases awaiting actions that were nearly one month old. Filing 58 at 28. The next month, the County also noted that Weber failed to take timely action on a task in one of her case. Filing 58 at 34. On May 5, Weber received a written warning to "improve [her] work performance in the administration of your caseload." Filing 58 at 34. And in the first few months of 2016, the County also documented various occasions where, in its view, Weber's performance fell short. *See* filing 58 at 37.

From this evidence, a fact-finder could reasonably infer that if Weber's performance alone had been the *true* motivation for her termination, she would have, or should have, been terminated earlier. Instead, Weber's termination followed closely on the heels of the submission of her FMLA paperwork, *see* filing 58-2 at 127, and just days before her need to actually take FMLA leave. *See id.* Based on the factual disputes and the temporal proximity between Weber's termination and her submission of FMLA paperwork and actual leave date, Weber has identified genuine issues of material fact on whether "a prohibited reason, rather than the employer's stated reason, actually motivated" her termination. *Torgerson*, 643 F.3d at 1047. Accordingly, a jury will resolve these factual disputes and the Court will deny the County's motion for summary judgment on those grounds.

## IV. CONCLUSION

In sum, the Court will grant the County's motion for summary judgment on Weber's ADA and NFEPA claims. The Court will also grant the County's motion for summary judgment as to Weber's allegations surrounding her 2014 FMLA leave. But the Court will deny the County's motion for summary judgment on Weber's 2016 FMLA interference and retaliation claims, and this matter will proceed to trial on those claims.

IT IS ORDERED that the County's motion for summary judgment (filing 54) is granted in part and denied in part, as forth above.

Dated this 1st day of April, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge